## The Mayor and City Council of Baltimore vs. John Boyd, Jr., et al.

*Construction of secs. 3 and 4 of Act of 1874, ch. 218, relating to Paving streets, &c., in the City of Baltimore— Tenant for life—Trustee—Guardian.*

A tenant for life of property fronting on a street in the City of Baltimore, is not the *owner* thereof within the meaning of section three of the Act of 1874, ch. 218, which declares that the Mayor and City Council of Baltimore shall have power and authority "to provide by general ordinance for the grading, gravelling, shelling, paving or curbing, or for the regrading, regravelling, reshelling, repaving or recurbing of any street, lane or alley, or part thereof in said city without the passage of a special ordinance in the particular case, whenever the *owners* of a majority of the front feet of property binding on such street, lane or alley, or part thereof, shall apply for the same," &c.

Where a person signs such application as trustee, without being then trustee, or having the legal title to the property for which he signs, vested in him as such, the Court has no power to convert his signature as *trustee* into a signature as *guardian* of his children who owned the property he professed to represent, though he may have been such guardian, and as such authorized by section 4, of the Act of 1874, ch. 218, to make the application for them.

APPEAL from the Circuit Court of Baltimore City.

The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., STONE, MILLER, ROBINSON, and IRVING, J.

*James L. McLane, City Counsellor,* for the appellant.

*J. Wilson Leakin,* and *Arthur W. Machen,* for the appellees.

MILLER, J., delivered the opinion of the Court.

The appeal in this case is from a *pro forma* decree of the Circuit Court of Baltimore City, granting a perpetual injunction restraining the collection of paving taxes assessed on the property of the appellees, binding on North avenue between Greenmount avenue and Belair avenue. The work of grading, curbing, and paving was done by the City Commissioner, under the provisions of General Ordinance No. 44 of 1874, upon an application professing to be signed by the owners of a majority of the front feet of ground binding on the portion of North avenue so graded, curbed, and paved. So much of that ordinance as is applicable to this case was passed in pursuance of the power granted to the City, by the third section of the Act of 1874, ch. 218, which declares that the Mayor and City Council shall have power and authority "to provide by general ordinance, for the grading, gravelling, shelling, paving or curbing, or for the regrading, regravelling, reshelling, repaving, or recurbing, any street, lane or alley, or part thereof in said city, without the passage of a special ordinance in the particular case, whenever the *owners* of a majority of the front feet of property binding on such street, lane, or alley, or part thereof, shall apply for the same upon terms and under conditions to be prescribed in said general ordinance ; and for the assessment in any such case of the cost of such work in whole or in part *pro rata* upon all the property binding upon such street, lane, or alley, or part thereof, and for the collection of such assessment as other city taxes are collected."

One of the requisites to the validity of such taxes or assessments is that the application which is the basis of the City Commissioner's action shall be signed by the *owners* of a majority of the front feet, and it has long been settled law in this State that the want of such majority owners may be set up by any property owner whose property is thus assessed, as a defence to an action by the city

to recover such assessments. This was decided as long ago as 1855 in *Henderson vs. Mayor, &c. of Baltimore, use of Eschbach,* 8 *Md.,* 352, under a similar law then in force. The important question arising for the first time in this case, is whether a *tenant for life* of property fronting on a street thus to be paved, is competent to sign such an application in order to make up the requisite majority, or, in other words, is he "an owner" within the purview of this statute?

It is true that in the absence, as in our State, of any special legislation on the subject, the life tenant must pay all the ordinary annual taxes levied on the property, and also keep down the interest on incumbrances out of the rents and profits. 2 *Desty on Taxation,* 695; *Burroughs on Taxation,* 223; *Cooley on Taxation,* 288; *Spangler vs. York County,* 13 *Penn.,* 327; *Barney vs. Stephens,* 22 *Maine,* 331. But in case of an assessment for a betterment on real estate the rule would seem to be different. Such betterment is regarded as an incumbrance to which the tenant for life must contribute to the extent of the interest during his life on the money paid, and at his death the remainderman must bear the charge of the principal. He must pay the annual interest on the assessment, but the principal is chargeable to the remainderman. 2 *Desty on Taxation,* 696; *Plympton vs. Boston Dispensary,* 106 *Mass.,* 544; *Peck, Executor, &c. vs. Sherwood,* 56 *N. Y.,* 615; *Gillespie vs. Brooks,* 2 *Redfield's Surrogate Rep.,* 363. This Court has also decided that assessments upon the owners of adjacent property to pay the expenses incident to the paving of streets, though levied in the exercise of the taxing power, are not "taxes" in the ordinary sense of the term, but are rather *charges* upon the land inseparably incident to its location in regard to other property. *Mayor, &c. vs. Proprietors of Greenmount Cemetery,* 7 *Md.,* 517; *Gould vs. Mayor, &c., of Baltimore,* 59 *Md.,* 378. The case of *Whyte vs. Mayor, &c. of Nashville,* 2 *Swan (Tenn.*

*Rep.,*) 364, has been much relied on by counsel for the appellants, and it is the only authority he has produced bearing upon the subject.   In that case a *tenant in dower* was held to be the *"owner"* within the meaning of the charter of Nashville, which compelled the owners to pay the costs of laying down *foot pavements* in front of their lots if they failed to lay them themselves.   We should not consider ourselves bound by the decision in this single case, even if it were directly in point.   But there is this distinction between that case and this : the Tennessee law and the by-law passed in pursuance thereof, simply made such costs a personal charge against the owners, while in our case the assessments are liens upon the whole property, and the entire interest of both life tenant and reversioner may be sold for their payment.

But we think the question is settled by our own statutes upon the subject.   The fourth section of the Act of 1874, ch. 218, which immediately follows the one already quoted, provides that " a tenant for ninety-nine years, or for ninety-nine years renewable forever, or the executor or administrator of such tenant, or the guardian of an infant owner, or a mortgagee in possession, shall be deemed and taken as an *owner* for the purpose of any application to the Mayor and City Council authorized by this Act, and the application of any such person shall bind the property so represented for any assessment or tax made under an ordinance passed in pursuance of the provisions of this Act."   In the original law which first granted the power the same persons are named with the exception of "the guardian of an infant."   2 *Code (Public Local Laws), Art. 4, sec.* 848.   It thus appears not only that in this careful enumeration made in the original Act, of persons other than the absolute owner in fee, who should be regarded as owners for the purpose of such an application, a life tenant is not mentioned; but when the subject was again before the Legislature and they added the guardian of an infant, he

is still not mentioned. It would seem therefore, that he was purposely excluded by the law-makers, and that we should be doing violence to the statute as well as to the intention of the Legislature, by making law instead of construing it, now to place him in the list. And are there not good reasons why he should be thus excluded? The theory upon which such assessments are thrown upon the property owners and not upon the public generally is, that their property is specially enhanced in value by such improvements. Now a life tenancy is of very uncertain duration, and probably in most cases the reversioner would reap much the larger part of the benefits to be derived from the improvement, and this makes it eminently proper that he should unite with the life tenant in the application. Again the reversioner may not think the improvement would result in a benefit and would therefore be unwilling to have it made and the consequent costs made a lien on his interest in the property. At all events he should be allowed to exercise his own judgment and discretion in the matter. We are therefore clearly of opinion that it is not competent for a life tenant to sign such an application as representing and binding the whole property to the payment of such assessments.

The signatures of the two life tenants, Mrs. Rost, and Mrs. Boone to this application must therefore be disregarded and set aside. Richard Cromwell who professed to represent the other portion of the Kennedy estate, signed as *trustee :*—but it is clear that he was not then trustee and did not have the legal title to the property vested in him as such. We have no power to convert his signature as *trustee* into a signature as *guardian* of his children, though he may have been such guardian. Striking these names from the list the requisite majority is wanting, and it follows that the decree must be affirmed.

*Decree affirmed.*

(Decided 23rd June, 1885.)